**Nos. 25-2145, 25-2147**

# United States Court of Appeals for the Federal Circuit

**ENTROPIC COMMUNICATIONS, LLC,**

*Appellant,*

*v.*

**DISH NETWORK L.L.C., DIRECTV, LLC,**

*Appellees.*

APPEALS FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NOS. IPR2024-00393, IPR2024-01059.

**APPELLEES DISH NETWORK L.L.C.'S AND DIRECTV, LLC'S RESPONSE BRIEF**

Ruffin B. Cordell
Adam R. Shartzer
Michael J. Ballanco
FISH & RICHARDSON P.C.
1000 Maine Avenue S.W., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
shartzer@fr.com

Christopher S. Marchese
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070

Alyaman Amer
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
Tel: (214) 747-5070

April 20, 2026

*Attorneys for Appellee
DISH Network L.L.C.*

*Counsel for Appellee DirecTV on
Inside Cover*

Daniel C. Tucker
FINNEGAN, HENDERSON, FARABOW,
 GARRETT AND DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
Tel: (571) 203-2793
daniel.tucker@finnegan.com

Cory C. Bell
FINNEGAN, HENDERSON, FARABOW,
 GARRETT AND DUNNER, LLP
2 Seaport Lane, 6th Floor
Boston, MA 02210
Tel: (617) 646-1641
cory.bell@finnegan.com

Yongyuan Gao Rice
FINNEGAN, HENDERSON, FARABOW,
 GARRETT AND DUNNER, LLP
901 New York Avenue N.W.
Washington, DC 20001
Tel: (202) 714-5958
michelle.rice@finnegan.com

*Attorneys for Appellee*
*DirecTV, LLC*

## EXEMPLARY CLAIM AT ISSUE ON APPEAL

**Claim 1 of U.S. Patent No. 7,295,518 (Appx79)**

1. A data communication network comprising:

at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

## CERTIFICATE OF INTEREST

Counsel for Appellee DISH Network L.L.C. certifies the following:

1.    Provide the full names of all entities represented by undersigned counsel in this case.

**DISH Network L.L.C.**

2.    Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

**None.**

3.    Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

**DISH Network L.L.C. is a wholly-owned subsidiary of DISH DBS Corporation.**

**DISH Network L.L.C. and DISH DBS Corporation are wholly-owned indirect subsidiaries of DISH Network Corporation.**

**DISH Network Corporation is a wholly-owned subsidiary of EchoStar Corporation, with publicly traded equity (NASDAQ:SATS).**

**Over 10% of EchoStar Corporation's publicly traded stock is owned by BlackRock, Inc., with publicly traded equity (NYSE: BLK).**

4.    List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

**Fish & Richardson P.C.: Matthew P. Mosteller, John J. Thuermer, Timothy Riffe, Usman Khan**

5.    Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

**Yes (*see* DISH's Notice of Related Case Information filed at Dkt. 10).**

i

6.    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated:  April 20, 2026                              */s/ Adam R. Shartzer*
                                                               Adam R. Shartzer

## CERTIFICATE OF INTEREST

Counsel for DirecTV, LLC certifies the following:

1.  Provide the full names of all entities represented by undersigned counsel in this case.

    **DirecTV, LLC**

2.  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

    **None/Not Applicable.**

3.  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    **TPG Capital**

4.  List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

    **Finnegan, Henderson, Farabow, Garrett & Dunner, LLP: Daniel F. Klodowski, Safiya Aguilar, Victor Palace**

5.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

    **Yes (*see* DirecTV's Notice of Related Case Information filed at Dkt. 16).**

6.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

    **None/Not Applicable.**

Dated:  April 20, 2026

*/s/ Cory C. Bell*
Cory C. Bell

iii

## **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ................................................................. i

CERTIFICATE OF INTEREST ................................................................ iii

STATEMENT OF RELATED CASES ...................................................... 1

RESPONSIVE STATEMENT OF THE ISSUES ...................................... 2

INTRODUCTION .................................................................................... 3

COUNTER-STATEMENT OF THE CASE ............................................. 4

I.      THE '518 PATENT ...................................................................... 4

II.     THE PRIOR ART ......................................................................... 5

III.    THE PTAB PROCEEDING ......................................................... 7

IV.     THE BOARD'S DECISION .......................................................... 8

SUMMARY OF THE ARGUMENT ....................................................... 9

ARGUMENT .......................................................................................... 12

I.      STANDARD OF REVIEW ......................................................... 12

II.     SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S
        FINDING ON THE LEVEL OF ORDINARY SKILL ................ 13

        A.      The Intrinsic Record Supports the Board's Finding .......... 13

        B.      Federal Circuit Precedent Supports the Board's POSITA
                Articulation ........................................................................ 18

        C.      The Extrinsic Evidence Supports the Board's Level of
                Skill Finding ...................................................................... 20

        D.      The Board Did Not Misapprehend Entropic's Position ..... 22

        E.      The Board's Reliance on the '518 Patent's Specification
                Constitutes Substantial Evidence ...................................... 24

F.      Even Were there Error With the Board's Level of Skill, It Would Be Harmless.................................................30

III.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT ISAKSSON IS ANALOGOUS ART................................32

A.      Isaksson Is Reasonably Pertinent to the Problems of the '518 Patent.................................................32

B.      The Board Properly Declined to Reach the Field of Endeavor.................................................36

IV.     SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS OF A MOTIVATION TO COMBINE FOR GROUND 2.................................................36

A.      The Board Explicitly Weighed Benefits and Drawbacks of Combining Jacobsen and Amit.................................................37

B.      Dr. Williams's Testimony Is Not Self-Contradictory.................................................40

C.      Entropic's Cost Arguments Were Considered and Rejected.................................................43

D.      Entropic Requests Improper Reweighing of Evidence.................................................45

V.      SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT JACOBSEN IS PRIOR ART.................................................47

A.      The Totality of the Evidence Supports Public Accessibility.................................................47

B.      The Board Did Not Rely on Inadmissible Hearsay.................................................48

C.      Entropic's Attacks on the Evidence Are Unavailing.................................................49

D.      Impact of Any Error Is Limited to Ground 2.................................................52

CONCLUSION.................................................53

CERTIFICATE OF SERVICE AND FILING.................................................57

CERTIFICATE OF COMPLIANCE.................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
935 F.3d 1319 (Fed. Cir. 2019) ...........................................................12, 24, 30

*Best Med. Int'l v. Elekta Inc.*,
46 F.4th 1346 (Fed. Cir. 2022) ...........................................................12, 13, 19

*Bos. Sci. SciMed, Inc. v. Iancu*,
811 F. App'x 618 (Fed. Cir. 2020) ...........................................................21, 46

*BTG Int'l v. Amneal Pharms. LLC*,
923 F.3d 1063 (Fed. Cir. 2019) ...........................................................24

*In re Clay*,
966 F.2d 656 (Fed. Cir. 1992) ...........................................................32, 36

*Consol. Edison Co. of New York v. NLRB*,
305 U.S. 197 (1938)...........................................................12

*Daiichi Sankyo Co. v. Apotex, Inc.*,
501 F.3d 1254 (Fed. Cir. 2007) ...........................................................13, 14, 19, 20

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020) ...........................................................32, 33, 34

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) ...........................................................12, 24, 27

*Finesse Wireless LLC v. AT&T Mobility LLC*,
156 F.4th 1221 (Fed. Cir. 2025) ...........................................................41, 42

*Finjan, Inc. v. Cisco Sys., Inc.*,
837 F. App'x 799 (Fed. Cir. 2020) ...........................................................32

*Glob. Health Sols. LLC v. Selner*,
148 F.4th 1363 (Fed. Cir. 2025) ...........................................................30

*Google LLC v. MindbaseHQ, LLC*,
No. 2023-1622, 2025 WL 2471511 (Fed. Cir. Aug. 28, 2025)...........................18

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ............................................................................12

*Grit Energy Sols., LLC v. Oren Techs., LLC*,
   957 F.3d 1309 (Fed. Cir. 2020) ......................................................39

*In re Hall*,
   781 F.2d 897 (Fed. Cir. 1986) ........................................................48

*Hologic, Inc. v. Minerva Surgical, Inc.*,
   764 F. App'x 873 (Fed. Cir. 2019) ...............................13, 14, 18, 19

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 784 (Fed. Cir. 2021) .........................................................45

*ION, Inc. v. Sercel, Inc.*,
   No. 5:06-CV-236, 2009 WL 10677701 (E.D. Tex. Dec. 11, 2009) ...................48

*Koito Manufacturing v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004) ......................................................21

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)........................................................................45

*In re Lister*,
   583 F.3d 1307 (Fed. Cir. 2009) ......................................................47

*McCoy v. Heal Sys., LLC*,
   850 F. App'x 785 (Fed. Cir. 2021) .................................................30

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ......................................................45

*In re NTP, Inc.*,
   654 F.3d 1279 (Fed. Cir. 2011) ...........................................44, 48, 50

*Paice LLC v. Ford Motor Co.*,
   881 F.3d 894 (Fed. Cir. 2018) ...................................................15, 16

*Regents of the Univ. of Minn. v. Gilead Scis., Inc.*,
   61 F.4th 1350 (Fed. Cir. 2023) ...................................................21, 45

*Telefonaktiebolaget LM Ericsson v. TCL Corp.*,
  941 F.3d 1341 (Fed. Cir. 2019) ................................................................48

*TQ Delta, LLC v. Cisco Systems, Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ................................................................21

*Unwired Planet, LLC v. Google Inc.*,
  841 F.3d 995 (Fed. Cir. 2016) ..................................................................43

*VidStream LLC v. Twitter, Inc.*,
  981 F.3d 1060 (Fed. Cir. 2020) ..........................................................49, 52

*In re Watts*,
  354 F.3d 1362 (Fed. Cir. 2004) ................................................................30

*Winner Int'l Royalty v. Wang*,
  202 F.3d 1340 (Fed. Cir. 2000) ................................................................45

*Yorkey v. Diab*,
  601 F.3d 1279 (Fed. Cir. 2010) ................................................................21

**Other Authorities**

Fed. R. Evid 803(6) ....................................................................................49

## STATEMENT OF RELATED CASES

The '518 patent (U.S. Patent No. 7,295,518) at issue in this appeal is asserted in *Entropic Communications, LLC v. DISH Network Corporation, et al.*, No. 2:23-cv-01043-JWH-KES (C.D. Cal.).

1

**RESPONSIVE STATEMENT OF THE ISSUES**

1.      Whether substantial evidence supports the Board's finding that the level of ordinary skill in the art encompasses experience in broadband communication networks, rather than being exclusively limited to experience with coaxial cables.

2.      Whether substantial evidence supports the Board's finding that the Isaksson prior art is reasonably pertinent to the problems addressed by the '518 patent, where both the prior art and the patent use the known technique of "bit loading" to address channel impairments, such as inter-symbol interference and noise, on wired mediums.

3.      Whether substantial evidence supports the Board's finding that a skilled artisan would have been motivated to combine Amit and Jacobsen where the Board weighed the benefits and drawbacks of the combination.

4.      Whether the Board properly relied on the totality of the evidence— including librarian testimony, library cataloging records, and corroborating documentary evidence—to find that Jacobsen was publicly accessible before the critical date.

## **INTRODUCTION**

The Board correctly determined that claims 1 and 3 of U.S. Patent No. 7,295,518 ("the '518 patent") are unpatentable as obvious. Entropic's appeal is an attempt to relitigate, under the guise of legal error, what are plainly factual disputes settled by the Board. Unable to overcome the substantial evidence supporting the Board's Final Written Decision ("FWD"), Entropic asks this Court to reweigh the credibility of experts and re-evaluate the prior art—functions reserved for the factfinder.

The Board's decision is not a product of "overgeneralization," as Entropic alleges, but a careful and precise application of the prior art to the challenged claims. The Board properly defined the person of ordinary skill in the art ("POSITA") based on the '518 patent's own reliance on non-coaxial technologies, the patent's description of the technical field as "broadband communication networks," and expert testimony explaining the cross-applicability of signal-processing techniques across wired mediums. The Board correctly found that Isaksson is analogous art because it addresses the same signal impairment problems faced by the inventors—inter-symbol interference ("ISI") and noise—and employs the same bit-loading solution.

Entropic's remaining arguments about motivation to combine and prior art status apply only to the second ground that the Board found renders the '518 patent

obvious—the combination of Amit, Isaksson, and Jacobsen. These arguments likewise do not carry the day for Entropic. The Board weighed the motivation-to-combine evidence, including both the performance benefits and the alleged cost drawbacks, and credited the testimony DISH submitted from Dr. Williams over what Entropic submitted from Mr. Garrett. And the Board's finding that Jacobsen qualifies as prior art rests on a totality of evidence—including librarian testimony, library acquisition records, documentation about the in-person convention to which the paper was submitted, and corroborating publications—not on inadmissible hearsay.

Because a reasonable mind could (and would) accept the evidence the Board relied upon as adequate to support each of its conclusions, this Court must affirm.

## COUNTER-STATEMENT OF THE CASE

### I.    THE '518 PATENT

The '518 patent is titled "Broadband Network for Coaxial Cable Using Multi-Carrier Modulation." Appx63. The patent describes a broadband local area data network that uses coaxial cable wiring for interconnecting terminal devices. Appx63, Abstract. Orthogonal frequency division multiplexing ("OFDM") with bit loading is used to overcome channel impairments and provide a path for terminal devices to

transmit data to and receive data from other terminal devices.[1] *Id*. Probe messages are sent between devices to characterize the communication channel and determine optimum bit loading. *Id*.

Significantly, the '518 patent describes its technical field as "broadband communication networks and specifically to communications using coaxial cable building wiring." Appx74, 1:27–30. The specification extensively references prior art applying communication techniques—including multi-carrier modulation and bit loading—to twisted pair wiring and other non-coaxial mediums. *See* Appx75, 3:49–50 (Rubinstain: Ethernet over twisted pair); Appx75, 3:67–4:2 (Humphrey: OFDM over twisted pair loop); Appx77, 8:19–26 (Isaksson patent: DMT and a bit loading technique for point-to-point twisted pair wiring). The '518 patent does not merely distinguish these references as prior art that it seeks to improve upon, but incorporates their teachings by reference into its specification. *See, e.g.*, Appx75, 3:25–40; Appx75, 3:67–4:2; Appx77, 8:19–23.

## II.    THE PRIOR ART

*Kliger*, Appx1243-1279, is titled "Home Network System and Method" and describes a communication network suitable for use in residential buildings, implemented on existing cable television coaxial wiring with splitters. Appx1264,

---

[1] The '518 patent also refers to OFDM as Discrete Multitone (DMT). Appx77, 7:25–27.

¶ 2; Appx1266, ¶¶ 40–41. Kliger's home network modules ("HNMs") communicate with each other over coaxial cables using multi-carrier modulation, such as OFDM or DMT. Appx1269, ¶¶ 69, 73.

*Isaksson*, Appx1341-1465, is titled "Improvements in, or Relating to, Multi-Carrier Transmission Systems." Isaksson discloses multi-carrier transmission systems with the facility to dynamically change carrier bit-loading. Appx1343, 1:3–7. Isaksson estimates channel characteristics through periodic transmission of base sync frames—functionally equivalent to the '518 patent's probe messages—and selects bit-loading factors based on signal-to-noise ratios. Appx16 (citing Isaksson, 5:14–6:1, 16:8–12, 54:16–21). Isaksson expressly states that its invention "can be used not only with the MUSIC [(Multicarrier System for the Installed Copper network)] system as herein described, but with other multi-carrier systems employing dynamic bit loading." Appx1414, 72:5–8.

*Amit*, Appx1466-1490, is titled "System and Methods for Home Network Communications" and provides a method and system for home networking over coaxial cables. Appx1475, 2:53–55. Amit's home cable networking devices communicate using signaling over coaxial cables through splitters. Appx1476-1477, 3:19–21, 6:29–41.

*Jacobsen*, Appx1547-1561, is titled "An Efficient Digital Modulation Scheme for Multimedia Transmission on the Cable Television Network." Jacobsen compares

single-carrier modulation with equalization and multi-carrier modulation on simulated cable television channels. It teaches that signal reflections caused by taps, amplifiers, and splitters on coaxial networks can negatively affect digital data transmission. Appx1554-1555. These reflections may result in adjacent data bits (symbols) overlapping and interfering with each other, an effect known as inter-symbol interference, or ISI. *Id.* Jacobsen teaches that multi-carrier modulation, like DMT, may be used to combat ISI. *Id.*

## III.   THE PTAB PROCEEDING

DISH Network L.L.C. filed a petition for *inter partes* review, Appx162-261, challenging claims 1 and 3 of the '518 patent. Appx2.[2] In the Petition, DISH proposed a level of ordinary skill requiring a degree in electrical or computer engineering and experience in "signal processing and/or communication systems/networks." Appx10 (citing Appx960-961 ¶¶ 22–23). Entropic's expert, Mr. Garrett, counter-proposed a POSITA with "at least two years of experience with coaxial cables." Appx3560, ¶ 37.

The parties' proposed skill levels were similar, except for the POSITA's experience. Appx10. After considering both proposals, the intrinsic record, and the extrinsic testimony, the Board adopted a level of skill requiring "at least a bachelor's

---

[2] DirecTV filed a substantively identical petition with a motion for joinder. Appx4102-Appx4196; Appx4200-Appx4208.

degree in electrical engineering, computer engineering, or a related field and two to three years of experience working in broadband communication networks." Appx12. In reaching this determination, the Board cited the technical field, the challenged claims, the specification's references to non-coaxial technologies, and its finding that the patent's teachings are cross-applicable to other wired mediums. Appx11-12.

DISH challenged the claims on two grounds. In Ground 1, DISH argued that claims 1 and 3 were unpatentable as obvious over Kliger and Isaksson. Appx9. In Ground 2, DISH argued those claims were unpatentable as obvious over Amit, Jacobsen, and Isaksson. Appx9. Entropic did not dispute that the combination of references in each of the two grounds teaches or suggests each limitation of the challenged claims. Appx24; Appx48. Instead, Entropic contested only the Board's underlying factual findings—the level of ordinary skill, analogousness of Isaksson, motivation to combine, and Jacobsen's prior-art status.

## IV.   THE BOARD'S DECISION

The Board found the challenged claims unpatentable as obvious under both petitioned grounds. Appx61. The Board adopted a level of skill requiring a bachelor's degree in electrical or computer engineering with two to three years of experience in broadband communication networks. Appx12. The Board then addressed and rejected Entropic's challenges as to the analogousness of Isaksson, motivation to combine, and Jacobsen's prior-art status.

8

The Board found that Isaksson is analogous art under the "reasonably pertinent" prong because both the '518 patent and Isaksson address channel impairments such as ISI and noise, and both use bit loading to overcome them. Appx17–18. The Board also found that a POSITA would have been motivated to combine the references in both grounds, crediting Dr. Williams's testimony and the teachings of the prior art. Appx19–23; Appx39–46. Finally, the Board found that Jacobsen was publicly accessible more than one year before the '518 patent's priority date based on the totality of the evidence. Appx37–39.

On appeal, Entropic does not dispute that the combination of references teaches or suggests every limitation of the challenged claims. Entropic challenges only the Board's underlying factual findings regarding the POSITA, analogousness of Isaksson, motivation to combine Jacobsen and Amit (relevant only to Ground 2), and Jacobsen's prior-art status (relevant only to Ground 2).

## SUMMARY OF THE ARGUMENT

This Court should affirm the Board's decision finding the challenged claims of the '518 patent unpatentable. Each of Entropic's arguments boils down to a request for this Court to reweigh the evidence—which substantial evidence review specifically prohibits.

First, the Board's definition of the POSITA as a broadband communications engineer is grounded in substantial evidence from the intrinsic record. The '518

9

patent describes its technical field as "broadband communication networks" (Appx74, 1:27–29), repeatedly references and incorporates by reference prior art addressing twisted pair and other non-coaxial mediums, and, as the Board found, "its teachings are applicable to any network experiencing multipath reflections" (Appx99). Before making its determination, the Board considered both parties' proposals, the claims, the specification, and expert testimony. Entropic's insistence on mandatory coaxial-specific experience is unsupported by the intrinsic record and would improperly narrow the field. Even if the Board did err, it would be harmless because even a POSITA with coaxial experience would recognize the cross-applicability of Isaksson's signal impairment solutions.

Second, for Grounds 1 and 2, the Board's finding that Isaksson is analogous art under the "reasonably pertinent" prong is well-supported. Both the '518 patent and Isaksson address the shared problem of channel impairments—including ISI, attenuation, and noise—and both employ the shared solution of bit loading based on channel characteristics. That Isaksson operates on twisted pair, rather than coaxial, is legally irrelevant to the reasonable pertinence inquiry, which focuses on the problem being addressed, not the physical medium.

Third, the Board properly weighed the benefits and drawbacks of combining Amit with Jacobsen (Ground 2). The Board credited Dr. Williams's declaration testimony that the performance benefits of multi-carrier modulation—including

10

improved spectral efficiency, computational efficiency, and resilience to frequency-domain impairments—outweighed the costs Entropic alleged. The Board found Entropic's arguments "unavailing," in part, because Entropic failed to address the cost-mitigation techniques that DISH identified. Entropic's attack on Dr. Williams's deposition cross-examination testimony ignores the full record the Board considered (including the credited declaration testimony) and raises a credibility challenge that the Board resolved against Entropic—a determination this Court may not revisit. Regardless, Entropic's motivation-to-combine argument does not bear on the Kliger and Isaksson combination (Ground 1), which the Board found independently renders the '518 patent obvious.

Fourth, the Board's finding that Jacobsen is prior art rests on the totality of the evidence, not on hearsay. Ms. Munford's librarian testimony, MARC (machine-readable cataloging) records, documentation about the in-person convention to which the paper was submitted, and corroborating publications establish that Jacobsen was publicly accessible well before the critical date. Entropic's speculation that MARC records could theoretically be edited does not overcome the Board's well-supported finding based on the record evidence. And this argument too only applies to Ground 2, and not Ground 1.

The Board's decision should be affirmed.

11

# ARGUMENT

## I.    STANDARD OF REVIEW

Obviousness is a question of law based on underlying factual determinations. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). While this Court reviews the ultimate obviousness determination de novo, the underlying factual findings— including the level of ordinary skill, analogous art, and motivation to combine—are reviewed for substantial evidence. *See Best Med. Int'l v. Elekta Inc.,* 46 F.4th 1346, 1353 (Fed. Cir. 2022). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

Under this highly deferential standard, "[i]f two inconsistent conclusions may reasonably be drawn from the evidence in record, the PTAB's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018). Even where "some evidence arguably cuts against the Board's conclusion," "the presence of evidence supporting the opposite outcome does not preclude substantial evidence from supporting the Board's fact finding." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1329 (Fed. Cir. 2019).

Entropic concedes that the Board's factual findings are reviewed for substantial evidence. Blue Br. 17, 20. Yet Entropic's brief is devoted to asking this

12

Court to credit different evidence, prefer different expert testimony, and draw different inferences from the same record the Board considered. That is precisely what substantial evidence review prohibits.

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING ON THE LEVEL OF ORDINARY SKILL

Entropic argues that the Board committed legal error by adopting a level of ordinary skill that did not require "at least two years of experience with coaxial cables." Blue Br. 21. This argument fails because the Board's determination is a factual finding amply supported by substantial evidence. *See Best Med. Int'l*, 46 F.4th at 1353 ("The Board's finding regarding the level of skill in the art is a question of fact that we review for substantial evidence."). Entropic must demonstrate that the Board's POSITA definition is unreasonable—not merely that its own definition is better.

### A.    The Intrinsic Record Supports the Board's Finding

The Board's determination of the level of ordinary skill is a factual finding guided by a non-exhaustive list of factors, including the type of problems encountered in the art, prior art solutions to those problems, and the sophistication of the technology. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). Critically, these factors are "merely a guide" and the Board "was not required to analyze level of skill in the art on a factor-by-factor basis." *Id.*; *Hologic, Inc. v. Minerva Surgical, Inc.*, 764 F. App'x 873, 879 (Fed. Cir. 2019). "It is enough

13

that [the Board] applied the principle of *Daiichi* and assessed level of skill in the art on a holistic basis." *Hologic*, 764 F. App'x at 879. That is precisely what the Board did here.

The Board grounded its POSITA level-of-skill finding in descriptions of the relevant art in the intrinsic record. It cited the '518 patent's technical field— "broadband communication networks and specifically . . . communications using coaxial cable building wiring" (Appx74, 1:25–30)—and found "it appropriate here to use the broader statement of 'broadband communication networks' as the field of a POSITA's experience." Appx11. The Board noted that the patent "repeatedly mentions prior art patents disclosing communication techniques applied to twisted pair wiring, including discrete multi-tone (DMT) modulation and bit loading." Appx11 (citing Appx75, 3:49–50, 3:67–4:2; Appx77, 8:19–26). It further cited the data network overlaying "cable or satellite services" (Appx76, 5:1–6), the claims describing "cable wiring" that "includes segments" of coaxial cable but is not limited to coaxial, and its finding that the patent's teachings are cross-applicable to other networks experiencing multipath reflections, regardless of the media for signal transmission. Appx11–12.

Each of these citations constitutes evidence from which a reasonable mind could conclude that the POSITA's level of skill need not be limited to coaxial-specific experience. The technical field description for the '518 patent itself

14

uses the broader category of "broadband communication networks" as the umbrella term, narrowing to coaxial cable as one specific application. Appx74, 1:25–30. The Board's decision to adopt the broader skill level was a reasonable resolution of competing evidence about how to characterize the POSITA's experience.

Entropic argues that the Board cherry-picked the first half of the technical field while ignoring the second half. Blue Br. 34. But the Board acknowledged the full statement and made a reasoned judgment about which framing better captured the POSITA's experience, explaining its rationale based on the patent's cross-medium disclosures. *See* Appx11. That the Board resolved this question differently than Entropic preferred does not render the Board's determination unsupported.

Other disclosures in the '518 patent confirm the cross-medium nature of the claimed techniques. The specification cites and incorporates by reference nearly twenty prior art references covering various network types, including multiple twisted-pair references that employ the claimed bit loading and multi-carrier modulation. Appx3143, ¶ 28; Appx968-971, ¶¶ 40–44. Entropic contends that these references are cited only to be distinguished from the coaxial-specific invention. Blue Br. 31–33. Not so. First, by incorporating this prior art by reference into the '518 patent's specification, *see, e.g.*, Appx75, 3:49–50, 3:67–4:2,[3] the inventors

---

[3] *See, e.g.*, *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 906 (Fed. Cir. 2018) (explaining that references incorporated become "effectively part of the host document as if [they] were explicitly contained therein").

signaled that the underlying communication techniques—including multi-carrier modulation and bit loading over twisted pair—were part of the knowledge base relevant to the invention. Second, the Isaksson patent cited in the '518 patent's specification (Appx77, 8:19–26) appears not in the background section but in the detailed description of the patent, further demonstrating the inventors' engagement with non-coaxial technologies as part of their disclosure. Although the Isaksson patent cited in the '518 specification shares inventorship and a filing date with Isaksson (the reference used in Grounds 1, 2), the two address different technical solutions.

Third, the record establishes that it is reasonable to view these extensive cross-references as evidence that the inventors were aware of and drew upon a broader wired communications landscape, informing what a POSITA would have known. The question is not whether the patent distinguished twisted-pair systems, but whether the existence of these cross-references supports that a POSITA would have a broader background than coaxial technologies alone. The Board concluded they do, and the non-coaxial disclosures in the expressly incorporated references, which form part of the patent itself, *see Paice*, 881 F.3d at 906, support that conclusion.

Furthermore, the claims of the '518 patent do not limit the network exclusively to coaxial cable. Claim 1 recites "cable wiring comprising . . . a plurality of segments of coaxial cable." Appx79, 12:8–26. As the Board observed, "[t]his does

16

not mean that the 'cable wiring' is strictly coaxial—only that it includes segments that are." Appx11. Many broadband networks include multiple wiring types (coaxial, twisted pair, fiber optic), and the claim language reflects this reality. *See* Pet. Hearing Demonstratives, Appx3373-3374 (citing, Appx2548; Appx3138-3139, ¶¶ 17–18; Appx1475, 1:30–40, 2:4–13).

The Board also correctly found that the '518 patent's teachings are "applicable to any network experiencing multipath reflections which degrade the ability to achieve high data rates regardless of the media over which those signals are transmitted." Appx11–12 (citing Appx75, 4:19–32). Entropic argues this passage is coaxial-specific because it describes multipath caused by splitters in a "typical cable TV wiring configuration." Blue Br. 35–37. But the preceding paragraphs of the specification discuss non-coaxial networks (Rubinstain, Humphrey, and others), and the passage at issue describes signal impairments in "communication network[s]" generally, before more specifically describing those present in cable TV wiring. *See* Appx75, 3:25–4:18. Consistent with the non-limiting nature of the claims, the Board reasonably found that the '518 patent's teachings are not limited to coaxial networks. This finding is further supported by patents and textbooks that confirm the cross-medium applicability of these techniques. *See* Pet. Hearing Demonstratives, Appx3375 (citing Appx1586, 1:12–17; Appx1051-1052, ¶ 195; Appx2559; Appx3143-3145, ¶ 29).

17

**B.    Federal Circuit Precedent Supports the Board's POSITA Articulation**

Entropic's cited cases undercut its position. Both *Google LLC v. MindbaseHQ, LLC* and *Hologic, Inc. v. Minerva Surgical, Inc.* affirmed Board-adopted POSITA definitions that were broader than the respective patent owners sought—precisely the situation here.

In *Google LLC v. MindbaseHQ, LLC*, No. 2023-1622, 2025 WL 2471511 (Fed. Cir. Aug. 28, 2025), the patent owner argued that the Board adopted "too high a level of skill and qualifications untethered to the patents." *Id.* at *6. This Court affirmed, crediting the Board's determination that "the specification and claims demand knowledge of [petitioner's] identified areas, even though [petitioner's] precise words are not recited in them." *Id.* The Court noted that there was no merit to the patent owner's argument to the contrary, pointing out in particular the specification's numerous references to the relevant concepts. *Id.* The same reasoning applies here. Entropic argues that the Board's POSITA definition is untethered to the '518 patent because it does not mandate coaxial-specific experience. But the '518 patent's specification is replete with references to broadband communication techniques spanning multiple wired mediums—including its incorporation by reference of numerous twisted-pair prior art patents employing the same multi-carrier modulation and bit loading techniques at the heart of the claimed invention. Just as the Board in *MindbaseHQ* was entitled to define the POSITA

18

based on the breadth of technical concepts pervading the specification, the Board here reasonably defined the POSITA based on the '518 patent's own reliance on a broader landscape of broadband communication technologies, rather than artificially restricting the skilled artisan to coaxial-only experience.

In *Hologic, Inc. v. Minerva Surgical, Inc.*, 764 F. App'x 873, 879 (Fed. Cir. 2019), another patent owner argued that the POSITA needed experience specifically with uterine ablation devices because the claims were directed to uterine ablation. This Court affirmed the broader POSITA (experience with electrosurgical devices generally) because the specification "speaks in terms of 'body cavities,' with the uterus comprising just one example." *Id.* Here too, the '518 patent speaks in terms of "broadband communication networks," with coaxial cable comprising one specific application. The Court also rejected the argument that the Board was required to analyze the level of skill on a factor-by-factor basis under *Daiichi*, explaining that "it is enough that [the Board] applied the principle of *Daiichi* and assessed level of skill in the art on a holistic basis." *Id.*

And in *Best Medical International, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1354 (Fed. Cir. 2022), this Court held it "not unreasonable" to require computer programming experience where the specification was "replete with references" to computer implementation, even though computer programming was not the narrow focus of the claims. The same logic applies here: the '518 patent is replete with

19

references to broadband communication techniques spanning multiple mediums, supporting the Board's determination that the POSITA's experience base should be broadband communications rather than specifically coaxial.

Entropic relies on *Daiichi* to argue that the level of skill must track the specific problem the patent solves. Blue Br. 25–26. But *Daiichi* concerned a district court's error in adopting a level of skill untethered to the intrinsic record. There, the district court erroneously "looked to other [judicial] decisions involving patents for a method of treating a physical condition for guidance." *Daiichi*, 501 F.3d at 1257. In contrast, here, the Board's level of skill is directly tied to the patent's own technical field description ("broadband communication networks"), the cross-medium disclosures in the specification, and the expert testimony. Unlike the district court in *Daiichi*, the Board did not adopt a generic level of skill divorced from the patent; it adopted one grounded in the patent's broad description of its own field.

### C.     The Extrinsic Evidence Supports the Board's Level of Skill Finding

Expert evidence further supports the Board's determination regarding the level of skill in the art. DISH's expert Dr. Williams, for example, based on over forty years of professional experience in wireless communications and telecommunications technology, opined that multi-carrier modulation and bit loading were "commonly used in wired and wireless communication networks" and that a communications engineer could implement these techniques in a coaxial

network. Appx957, ¶ 10; Appx3134, ¶ 10. Appx3670, 43:11–22. Dr. Williams's qualifications include a Ph.D. in Electrical Engineering, over twenty-five U.S. patents in wireless and signal processing technology, and personal experience building networks with coaxial cable. Appx955-957, ¶¶ 3–9; Appx3635, 8:10–13.

Entropic attacks the testimony of Dr. Williams as "conclusory" under *TQ Delta, LLC v. Cisco Systems, Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019), and *Koito Manufacturing v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004). Blue Br. 28. These cases concern experts who offered no basis for their opinions whatsoever. Dr. Williams, however, provided a basis: his extensive professional experience working across communications engineering disciplines, including direct experience with coaxial networks. That Entropic disagrees with his opinion is a credibility matter, not a legal deficiency.

The competing testimony Entropic submitted from its expert, Mr. Garrett, that the POSITA needs "at least two years of experience with coaxial cables" does not compel a different result. The Board was entitled to credit Dr. Williams over Mr. Garrett on this factual question. *See Regents of the Univ. of Minn. v. Gilead Scis., Inc.*, 61 F.4th 1350, 1359 (Fed. Cir. 2023) ("It is within the discretion of the Board to weigh the evidence of record."); *Bos. Sci. SciMed, Inc. v. Iancu,* 811 F. App'x 618, 625 n.2 (Fed. Cir. 2020) (declining to reassess expert credibility of expert testimony before the Board) (citing *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed.

21

Cir. 2010) ("We defer to the [PTAB's] findings concerning the credibility of expert witnesses.")).

The extrinsic record further demonstrates the cross-applicability of the relevant signal processing techniques. Multi-carrier modulation and bit loading were well-known concepts deployed across wired communications mediums—both twisted pair and coaxial—at the time of the invention. Even Mr. Garrett acknowledged that, before the '518 patent, "multicarrier modulation was a well-known concept in the communications field." Appx3299, 47:1–4. Dr. Williams opined with specificity that, "[i]n the context of twisted pair and coax specifically, in view of their overlapping development, a POSITA would have been familiar with both mediums" and that "twisted pair and coaxial networks both used QAM [(Quadrature Amplitude Modulation)] as a modulation scheme." Appx3143-3144, ¶ 29. Dr. Williams further supported these opinions by referencing DSL textbooks and industry publications that confirm the cross-medium applicability of these techniques. *See* Appx3144, ¶ 29. A POSITA working in broadband communications would have been familiar with signal processing techniques deployed across both mediums, without requiring dedicated coaxial experience as a prerequisite.

### D.    The Board Did Not Misapprehend Entropic's Position

Entropic argues that the Board mischaracterized its proposal by stating "a POSITA would not be limited to experience only with 'coaxial cables.'" Blue Br. 28

(citing Appx11). Reviewing the Board's full analysis at Appx11–12, it is clear that the Board did not reject Entropic's proposal because it believed Entropic wanted *only* coaxial experience. The Board rejected the proposal because it concluded, based on the intrinsic and extrinsic evidence, that coaxial-specific experience was not a necessary prerequisite at all. The Board's analysis walks through the technical field, the claims, the specification's cross-medium references, and the teachings—all of which the Board found supported a POSITA with broadband communications experience, rather than mandatory coaxial experience.

Entropic also blames the Board for "miss[ing] the point" when analyzing the requirements of claim 1 in the context of the level of skill. Blue Br. 29. But Entropic's argument conflates two different questions: (1) whether the POSITA must understand coaxial systems and coaxial-applicable techniques, and (2) whether the POSITA must have dedicated coaxial experience. The Board's POSITA—a broadband communications engineer with two to three years of experience—would certainly understand coaxial cables, splitters, and tap ports. These are standard elements of broadband infrastructure that an engineer with the requisite experience would routinely encounter. As Dr. Williams explained, and the Board credited, "a POSITA can draw from the same toolbox of known solutions to address these impairments regardless of the medium." Appx20 (citing Appx3143, ¶ 27). The Board did not limit a POSITA to one who is ignorant of coaxial cable. Rather, it

23

defined one whose experience base is broadband communications generally, where the claimed techniques are cross-applicable across different wired mediums.

E.    **The Board's Reliance on the '518 Patent's Specification Constitutes Substantial Evidence**

Entropic devotes a considerable amount of its brief to arguing that the Board's citations to the '518 patent's specification do not constitute substantial evidence for the adopted level of skill. Blue Br. 30–38. Entropic's arguments fail because they mischaracterize the Board's reasoning and/or ask this Court to reweigh the evidence—which substantial evidence review does not permit. Substantial evidence requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *BTG Int'l v. Amneal Pharms. LLC*, 923 F.3d 1063, 1073 (Fed. Cir. 2019); *see also, e.g.*, *Elbit*, 881 F.3d at 1356 ("[The Board's] decision to favor one [reasonable] conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence."). And even where "some evidence arguably cuts against the Board's conclusion," "the presence of evidence supporting the opposite outcome does not preclude substantial evidence from supporting the Board's fact finding." *Arthrex*, 935 F.3d at 1329. Here, the Board identified multiple features of the specification supporting its broader POSITA, and each withstands scrutiny.

***References to Twisted-Pair Networks.*** Entropic argues that the '518 patent cites Rubinstain and Humphrey—both twisted-pair references—only to distinguish

24

them from the coaxial-specific problems the inventors solved. Blue Br. 31–33. This argument fails for three reasons. First, instead of being "distinguished" to be excluded, as Entropic suggests, Rubinstain and Humphrey are incorporated by reference into the specification. *See* Appx75, 3:49–50 ("U.S. Pat. No. 6,008,368[4] . . . issued to Rubinstain . . . incorporated herein by reference"); Appx75, 3:67–4:2 ("U.S. Pat. No. 5,959,967 . . . issued to Humphrey . . . incorporated herein by reference"). When the inventors chose to incorporate these non-coaxial references into their own disclosure, they signaled that the underlying communication techniques—including multi-carrier modulation and bit loading over twisted pair— were part of the knowledge base relevant to the invention. The Board was entitled to draw this inference.

Second, as noted, the Isaksson patent cited within the '518 patent's specification (U.S. Patent No. 6,438,174) appears not in the background section but in the detailed description itself, at column 8, lines 19–26. Appx77, 8:19–26 (disclosing "discrete multi-tone modulation and a technique for bit loading applied to point-to-point twisted pair wiring"). Entropic's framing—i.e., that these twisted-pair references serve only as background foils to the purported coaxial invention— cannot account for a twisted pair bit-loading reference that the inventors placed in

---

[4] The '518 patent includes a typographical error for Rubinstain's patent number, which is U.S. Pat. No. 6,0**8**8,368.

their own detailed description of the invention. The Board reasonably viewed this placement as evidence that the inventors drew upon twisted-pair techniques as part of the operative disclosure, not merely as prior art to be distinguished.

Third, and more broadly, the record establishes that it is reasonable to view the specification's extensive cross-references to non-coaxial technologies as evidence that the inventors were aware of and drew upon a broader wired communications landscape. The specification cites and incorporates by reference nearly twenty prior-art references covering various network types. Appx3143, ¶ 28; Appx968-971, ¶¶ 40–44. The question before the Board was not whether the patent distinguished twisted pair systems from the claimed coaxial invention, but whether the pervasive presence of these cross-medium references informed what a POSITA would know. The Board concluded they do, and that conclusion is supported by substantial evidence.

***The Technical Field.*** Entropic is wrong to argue that the Board improperly severed the first half of the '518 patent's technical field description—"This invention relates to broadband communication networks"—from the second half—"and specifically to communications using coaxial cable building wiring." Blue Br. 34. The Board did not ignore the second half of the sentence. Rather, the Board acknowledged the full statement and explained its reasoning for adopting the broader framing based on the totality of the specification's disclosures. *See* Appx11. The

26

Board found that the patent's repeated engagement with non-coaxial technologies, its overlay of "cable or satellite services" (Appx76, 5:1–6), and its cross-medium teachings supported defining the POSITA's experience at the "broadband communication networks" level, rather than at the narrower coaxial-specific level. That the Board resolved this question differently than Entropic preferred does not make its determination unreasonable. *See, e.g.*, *Elbit*, 881 F.3d at 1356 ("[I]f two inconsistent conclusions may reasonably be drawn from the evidence in record, the PTAB's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." (internal citation omitted)).

**The Claims.** Entropic argues that the Board "misses the point" about claim 1 for two reasons: (a) Entropic never argued every segment of cable wiring must be coaxial, only that the wiring must include coaxial cables; and (b) even if the cable wiring system is not exclusively coaxial, the claims still require network communication over coaxial cable through splitters, which is where coaxial experience purportedly becomes essential. Blue Br. 35. Neither point undermines the Board's finding. The Board observed that claim 1 recites "cable wiring" that "includes segments" of coaxial cable but is "not strictly coaxial." Appx11. This observation was part of the Board's broader analysis that the claims, read alongside the specification, describe a system employing broadband communication

27

techniques that are not unique to coaxial cable. A POSITA with two to three years of experience in broadband communication networks would understand coaxial cable, splitters, and tap ports—these are standard elements of broadband infrastructure. The Board did not define a POSITA who is ignorant of coaxial cable; it defined one whose background necessarily included coaxial experience.

***The Teachings of the '518 Patent.*** Entropic's most specific textual argument targets the Board's finding that the '518 patent's "teachings are applicable to any network experiencing multipath reflections which degrade the ability to achieve high data rates regardless of the media over which those signals are transmitted." Appx11-12 (citing Appx75, 4:19–32). Entropic contends this passage is coaxial-specific because, read in context, it describes multipath caused by splitters in a "typical cable TV wiring configuration" and the very next sentence narrows to "coaxial cable wiring installed in homes." Blue Br. 35–37 (citing Appx75, 4:25–28, 4:37–40). But Entropic's reading ignores the broader context. The preceding paragraphs of the specification (Appx75) at column 3, line 17 through column 4, line 18 discuss a variety of non-coaxial networks and prior art—including Rubinstain (twisted pair), Humphrey (twisted pair), and Langlais (optic fiber). The paragraph that Entropic disputes begins by describing multipath as impairing "the ability to achieve high data rates in a communication network" without limiting that observation to coaxial systems. Appx75, 4:19–26. It is only after this general

28

observation that the specification narrows to the "typical cable TV wiring configuration" as a specific example of a network experiencing such impairments. The Board's reading—that the teachings address multipath impairments generally, with coaxial being one application—is at least reasonable, which is all that substantial evidence review requires.

This reading is reinforced by extrinsic evidence. Patents and textbooks confirm the cross-medium applicability of the disclosed techniques. *See* Appx3375 (citing Appx1586, 1:12–17; Appx1051-1052, ¶ 195; Appx2559; Appx3143-3145, ¶ 29). Dr. Williams testified that, "[i]n the context of twisted pair and coax specifically, in view of their overlapping development, a POSITA would have been familiar with both mediums" and that "twisted pair and coaxial networks both used QAM as a modulation scheme." Appx3143-3145, ¶ 29. The Board was entitled to credit this testimony as further support for its finding that the '518 patent's teachings are not limited to coaxial systems.

In sum, each of the Board's citations to the specification—the twisted-pair references, the technical field, the claims, and the patent's teachings regarding multipath—constitutes relevant evidence from which a reasonable mind could conclude that the POSITA's experience-base should encompass broadband communication networks generally, rather than being artificially confined to coaxial cable. That Entropic attempts to marshal evidence pointing the other direction does

not defeat the Board's finding under substantial evidence review. *See Arthrex*, 935 F.3d at 1332.

### F. Even Were there Error With the Board's Level of Skill, It Would Be Harmless

Even assuming, *arguendo*, that the Board's POSITA definition was erroneous, under this Court's harmless error doctrine, there is no reason to set the Board's decision aside. The Court has "previously made clear that the harmless error rule applies to appeals from the Board just as it does in cases originating from district courts," and so "to prevail the appellant must not only show the existence of error, but also show that the error was in fact harmful because it affected the decision below." *Glob. Health Sols. LLC v. Selner*, 148 F.4th 1363, 1370 (Fed. Cir. 2025) (quoting *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004)). Even if the Court were to "deem that the Board's POSA definition was erroneous," there is no reversible error if there is "no indication that it affected the outcome." *McCoy v. Heal Sys., LLC*, 850 F. App'x 785, 788 (Fed. Cir. 2021).

Contrary to Entropic's contention (Blue Br. 38–39), requiring that the POSITA have coaxial-specific experience would not change the Board's finding on the analogousness of Isaksson. A POSITA with dedicated coaxial experience would still recognize that channel impairment mitigation techniques from adjacent wired fields—such as the bit-loading taught by Isaksson—are pertinent to the problems addressed by the '518 patent. Dr. Williams explained that, "[i]n the context of

30

twisted pair and coax specifically, in view of their overlapping development, a POSITA would have been familiar with both mediums" and "these differences would not have impeded a POSITA from cross-applying solutions between the two." Appx3143-3145, ¶ 29. Adding coaxial-specific experience would not make that cross-application less obvious—if anything, it would make Isaksson's pertinence even more apparent to a skilled artisan experienced in both the coaxial and twisted-pair mediums.

Entropic argues that a properly skilled artisan would have understood that Isaksson was not analogous art and that the '518 patent's problems were coaxial-specific. Blue Br. 38–39. But this conflates the POSITA inquiry with the analogous art inquiry. Even a POSITA with dedicated coaxial experience would recognize that channel impairment mitigation techniques from adjacent wired fields are pertinent to coaxial networking problems. As Dr. Williams testified, twisted-pair and coaxial networks shared overlapping development histories and employed common modulation schemes, such as QAM. Appx3143-3144, ¶ 29. A coaxial-experienced POSITA would not be blind to solutions from the closely related field of twisted-pair communications—a field sharing the same fundamental signal processing challenges and solutions. Entropic's argument thus fails on its own terms because even accepting Entropic's proposed POSITA, the Board's conclusions would not change.

31

Because any error in the POSITA definition would not have affected the Board's ultimate conclusions regarding analogous art, motivation to combine, or reasonable expectation of success, Entropic has not demonstrated any reversible or harmful error. *See Finjan, Inc. v. Cisco Sys., Inc.*, 837 F. App'x 799, 809 (Fed. Cir. 2020) (applying harmless error rule where alleged error did not undermine substantial evidence supporting the Board's finding).

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT ISAKSSON IS ANALOGOUS ART

Entropic challenges the Board's finding that Isaksson is analogous art, arguing that Isaksson relates to twisted-pair synchronization, rather than coaxial impairments. Blue Br. 40–43. The Board correctly found that Isaksson satisfies the "reasonably pertinent" prong of the analogous art test, and substantial evidence supports that finding.

### A. Isaksson Is Reasonably Pertinent to the Problems of the '518 Patent

A reference is analogous art if it is "reasonably pertinent to the particular problem with which the inventor is involved," even if it is in a different field of endeavor. *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020); *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992). The Board found that "both the '518 patent and Isaksson address the problem of channel impairments such as interference (e.g., ISI) and noise, and use the solution of bit loading to overcome

them." Appx18 (citing Appx75, 4:42–47; Appx1343, 1:3–7; Appx1348, 6:17–20; Appx1358, 16:10–16; Appx1421, 79:5–14). This finding is supported by substantial evidence.

The '518 patent seeks to overcome channel impairments by using probe messages to characterize the communication channel and determine optimum bit loading. Appx63, Abstract. These impairments include signal reflections, ISI, and signal attenuation. *See* Appx518-519, (citing Appx75, 3:5–19). Isaksson likewise addresses frequency-dependent loss and noise, and estimates channel characteristics by periodic transmission of base sync frames from one transceiver to another. Appx1352, 10:10–14; Appx1358, 16:8–14. Isaksson's channel characteristics include attenuation, phase shifting, and variance—the same types of impairments the '518 patent addresses. *Id.* Both the patent and Isaksson employ the same solution for channel impairments such as interference (ISI): bit loading based on signal-to-noise ratios to allocate data transmission across sub-carriers less affected by channel impairments. Appx75, 3:5–20; Appx1356; Appx1375; Appx1419.

Entropic's argument that Isaksson is not analogous rests entirely on the physical medium: Isaksson operates on twisted pair, rather than coaxial. Blue Br. 42–43. But this Court has made clear that the "reasonably pertinent" inquiry focuses on the *problem* addressed and is not limited by the physical characteristics of the device or medium. *See Donner Tech.*, 979 F.3d at 1359–60. As the Board correctly

recognized, differences in the physical medium "go more toward the field of endeavor than the reasonable pertinence of the problems each address." Appx18. The signal impairment problems—ISI, noise, and attenuation—and the signal processing solutions—multi-carrier modulation with bit loading—are functionally the same, regardless of the wire type. *See id.* (citing Appx75, 4:42–47; Appx1343, 1:3–7; Appx1348, 6:17–20; Appx1358, 16:10–16; Appx1421, 79:5–14).

Entropic attempts to narrow the '518 patent's problems to three coaxial-specific impairments: (1) inter-port isolation from communicating across splitters; (2) variable signal attenuation caused by different channel paths; and (3) imperfect connection points at splitters causing micro reflections. Blue Br. 40. But these are merely specific manifestations of the broader category of channel impairments that the Board correctly identified: ISI, attenuation, and noise. The '518 patent's abstract describes its invention as using "(OFDM) with bit loading . . . to overcome *channel impairments*." Appx63 (emphasis added). The patent does not limit the term "channel impairments" to coaxial-specific phenomena. Rather, the abstract uses the general term, and the detailed description explains how those general impairments manifest in a coaxial environment.

Entropic also argues that Isaksson's invention "relates to a method that, by means of a particular algorithm, ensures the synchronism of the system during configuration changes." Blue Br. 42 (citing Appx1346, 4:17–20). This articulation

selectively characterizes Isaksson. Isaksson's synchronization algorithm is a *solution* to the problem of maintaining connections during dynamic bit-loading changes—changes that are necessitated by channel impairments. Isaksson teaches that demand for high bit-rate traffic creates a need for multi-carrier modulation systems that adapt to changing channel conditions. Appx1343, 1:8–18. This is the same motivation underlying the '518 patent's invention. That Isaksson's synchronization features solve a related but slightly different sub-problem does not negate the fundamental overlap in the channel impairment problem both disclosures address.

Dr. Williams further confirmed that the techniques disclosed in Isaksson are not limited to any particular physical medium. He testified that "signal impairments such as reflections, noise, signal attenuation, and inter-symbol interference (ISI) are common challenges in nearly all communication mediums" and that "a POSITA can draw from the same toolbox of known solutions to address these impairments regardless of the medium." Appx3141-3143, ¶¶ 23–27. The Board was entitled to credit this testimony. Even Entropic's own expert, Mr. Garrett, acknowledged that "multicarrier modulation was a well-known concept in the communications field" generally. Appx3299, 47:1–4. This admission underscores that a POSITA would have looked across the multitude of wired mediums when searching for solutions to channel impairment problems.

35

Moreover, Isaksson itself is not limited to twisted pair. Isaksson expressly states that its invention "can be used not only with the MUSIC system as herein described, but with other multi-carrier systems employing dynamic bit loading." Appx1414, 72:5–8. Isaksson also discloses the distribution of VDSL signals over coaxial cables. *See* Appx3270-3271, 18:18–19:15; Appx3361, 109:4–22; Appx3169-3170, ¶ 81. These disclosures confirm that a POSITA would have looked to Isaksson when addressing signal impairments in coaxial networks.

## B. The Board Properly Declined to Reach the Field of Endeavor

Because Isaksson satisfies the "reasonably pertinent" prong, the Board was not required to determine whether it also shared the same field of endeavor. *See In re Clay*, 966 F.2d at 658–59 (noting reference is analogous if it satisfies *either* prong). Entropic's insistence that the physical medium renders the art non-analogous ignores the functional overlap in signal processing techniques that both references employ to solve the same problem type. The Board's finding should be sustained.

## IV. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS OF A MOTIVATION TO COMBINE FOR GROUND 2

The Board found motivation to combine the references in both grounds of unpatentability, and Entropic does not challenge the Board's finding as to Ground 1. For Ground 2, the Board found that a POSITA would have been motivated to combine Amit's coaxial home network with Jacobsen's multi-carrier modulation

36

and Isaksson's synchronized bit-loading. Appx39–46. That finding is supported by substantial evidence.

Entropic's primary challenge to the Board's motivation to combine finding for Ground 2 is that the Board relied on "faulty evidence" because Dr. Williams purportedly failed to weigh the drawbacks of the proposed combination of two of the three cited references, Amit and Jacobsen. Blue Br. 43–50. But, Entropic's argument ignores the declaration evidence credited by the Board and asks the Court to reweigh the evidence and substitute its judgment for the Board's—which substantial evidence review does not permit.

## A. The Board Explicitly Weighed Benefits and Drawbacks of Combining Jacobsen and Amit

With respect to Ground 2, the Board did not blindly credit Dr. Williams. It conducted a thorough analysis of the competing evidence. The Board acknowledged Entropic's arguments that "the addition of Jacobsen's multi-carrier modulation frustrates Amit's goal to lower cost and complexity." Appx42 (citing Appx449-454, 31–36). The Board then evaluated the competing evidence and found Entropic's arguments "unavailing to overcome Petitioner's showing that a POSITA would have recognized overall benefits from the combination." Appx44. In particular, the Board noted that Entropic "does not address the benefits resulting from the measures that Petitioner contends a POSITA would have known to use to reduce costs and complexities in the combination (reduced FFT size, alleviation of frequency-domain

37

ripple and interferers, improved computational efficiency, improved transmission frequency, and high spectral efficiencies)." Appx44.

The Board performed a methodical analysis. It first addressed Entropic's argument that Amit's reflections are beneficial to achieve on-premises communication and that a POSITA would not look to Jacobsen to reduce those reflections. Appx41–42. The Board found this argument unpersuasive because, as Entropic itself conceded, Amit also discloses that there are "houses where there is a problem with reflection." *Id*. (citing Appx448, 30 n.5; Appx1481, 13:54–14:1; Appx1484, 20:42–43). Amit thus teaches that reflections can be beneficial or deleterious depending on the circumstances, and a POSITA would have recognized the need, and would have looked, for techniques to manage problematic reflections.

The Board next addressed Entropic's cost and complexity arguments. It found that "Petitioner show[ed] that adding Jacobsen's multi-carrier modulation to Amit's system would not frustrate Amit's goals [of lower cost and complexity]," as Entropic contended. Appx42–44. The Board noted DISH's arguments and evidence of various known techniques that could mitigate the costs Entropic alleged, including dividing channels into subchannels, segmenting subchannels into disjointed groups, decreasing FFT size, and reducing the number of active channels. *See* Appx42–43 (citing Appx524-525, 15–16; Appx1717, 374; Appx1721-1722, 378–379; Appx3162-3164, ¶¶ 68–70). The Board also noted DISH's arguments that

Mr. Garrett's power consumption analysis was based on a specialized form of multi-carrier modulation (OFDM) not required by the challenged claims, and that his methodology relied on personal recollections despite not having worked in the field since 2019. Appx43 (citing Appx525; Appx3344, 92:7–11 and 92:14–21). The Board was entitled to find these criticisms persuasive and to discount Mr. Garrett's analysis accordingly. Like Mr. Garrett, Entropic focused on supposed drawbacks and failed to account for the benefits resulting from the proposed combination. *See* Appx44.

The Board credited Dr. Williams's testimony that "a POSITA properly weighing the benefits, both lost and gained, would implement Jacobsen's multi-carrier modulation in Amit's network." Appx44 (citing Appx3163, ¶ 70; *see also* Appx3162-3165, ¶¶ 68–73). Critically, Dr. Williams addressed the specific drawbacks that Mr. Garrett raised and explained how known techniques could mitigate them. Appx3162-3165, ¶¶ 68–73. The Board agreed "that a POSITA, weighing the benefits and drawbacks of implementing Jacobsen's multi-carrier modulation in Amit, would have found the combination overall beneficial in at least some circumstances." Appx44 (citing *Grit Energy Sols., LLC v. Oren Techs., LLC*, 957 F.3d 1309, 1323–24 (Fed. Cir. 2020)).

**B.** **Dr. Williams's Testimony Is Not Self-Contradictory**

Entropic's core argument is that Dr. Williams admitted in his deposition that he "did not consider any of the disadvantages caused by his proposed combinations or weigh them against his purported advantages." Blue Br. 44 (citing Appx3945–3946, 31:18–32:11). Entropic overstates this testimony. Dr. Williams's second declaration expressly addressed the drawbacks Mr. Garrett identified and explained why the benefits outweighed them. Appx3162–3165, ¶¶ 68–73.

Specifically, Dr. Williams criticized Mr. Garrett's purported power-increase drawback, explaining in detail why the example Mr. Garrett provided is "not representative of the actual power increase." Appx3164, ¶ 71 (citing Appx1556; Appx2301; Appx1717). Dr. Williams further explained how power increase would not be a drawback from combining the references because "the parameters of Jacobsen's solution can be tweaked to fit power consumption requirements." Appx3164-3165, ¶ 72 (citing Appx1721–1722). Dr. Williams also disputed Mr. Garrett's purported design challenge stemming from silicon by explaining that "[t]he costs of scaling to multi-carrier modulation using silicon would not have been significant." Appx3165, ¶ 73 (citing Appx1489, 29:15–18; Appx1366, 24:14–17).

Even were these drawbacks legitimate, Dr. Williams further explained that "[i]n another paper . . . Jacobsen's author conducted a cost-benefit analysis to evaluate implementing multi-carrier modulation in a coaxial network," and that this

"cost benefit analysis is representative of a POSITA's analysis in" the present scenario. Appx3163–3164, ¶ 70 (citing Appx1721–1722). Dr. Williams concluded that "a POSITA properly weighing the benefits, both lost and gained, would implement Jacobsen's multi-carrier modulation in Amit's network." *Id.* The Board cited this testimony from Dr. Williams in finding a motivation to combine the references. Appx44. That Dr. Williams characterized his deposition testimony in a way that Entropic interprets as a concession does not render his detailed written analysis on this point, relied upon by the Board, a nullity.

The full record does not support Entropic's argument that Dr. Williams "confirmed he did not weigh any benefits lost." Blue Br. 14 (citing Appx3945-Appx3946, 31:18–32:11). When asked at deposition whether downsides existed, Dr. Williams testified: "I have not expressed the opinion that there are downsides, and I've not enumerated those downsides in my report." Appx3946, 32:2–4. That was not a failure to analyze tradeoffs; it was a conclusion that Entropic's alleged "drawbacks" were non-factors. As explained, Dr. Williams's declaration spans several pages of analysis rebutting the alleged drawbacks that Mr. Garrett presented and explaining why performance benefits were paramount, which is the analysis the Board credited. Appx44.

Entropic cites *Finesse Wireless LLC v. AT&T Mobility LLC*, 156 F.4th 1221, 1227 (Fed. Cir. 2025), for the proposition that self-contradictory expert testimony is

41

insufficient to satisfy the substantial evidence standard. But *Finesse Wireless* concerned a situation where the party bearing the burden rested its *entire* case on self-contradictory testimony. *See id.* Here, the Board did not rest its finding solely on Dr. Williams's deposition testimony, nor is his testimony self-contradictory. Moreover, the Board relied upon—and its decision is supported by—several evidentiary foundations, including: (1) Dr. Williams's detailed written declarations, (2) the teachings of the prior art references themselves, and (3) its own analysis of the benefits and drawbacks. Appx42–44.[5]

Entropic also argued that neither Amit nor Jacobsen suffers from failing to provide synchronized bit loading. *See* Appx46. The Board, however, weighed the evidence and agreed with DISH that, "even if Jacobsen teaches synchronism, a POSITA would still look to Isaksson for details on how to implement synchronism."

---

[5] Moreover, the Board addressed the motivation to combine Isaksson with Amit and Jacobsen as well, which Entropic does not challenge. The Board found that a POSITA would have been motivated to improve the Amit-Jacobsen combination with Isaksson's synchronized bit-loading in order to "maintain connections between Amit's HCN devices." Appx40 (citing Appx1042-1045, ¶¶ 179–181). The Board also agreed with DISH that a POSITA "would have implemented Isaksson's base sync frames in Amit's network, particularly when Amit already uses management messages suitable for this purpose." Appx45. Entropic argued that Isaksson's base sync frames would not function on Amit's shared medium and that Isaksson does not extend to coaxial cables. The Board rejected both arguments, crediting Dr. Williams's testimony that incorporating signaling from a full-duplex system into a half-duplex system is within a POSITA's capabilities and that Isaksson expressly teaches its applicability beyond the specific system it describes. Appx44–45 (citing Appx1414, 72:5–8; Appx3165-3170, ¶¶ 74–81).

Appx46 (citing *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1003–04 (Fed. Cir. 2016)). This is a straightforward application of the principle that a POSITA may look to a reference for implementation details, even when the general concept is already known.

### C.     Entropic's Cost Arguments Were Considered and Rejected

Entropic devotes significant briefing to the alleged complexity and hardware and operational costs that Jacobsen's multi-carrier modulation would add to Amit's system. Blue Br. 45–50. The Board considered, and rejected, each of these arguments. *See* Appx42–44. The Board found that DISH showed "that adding Jacobsen's multi-carrier modulation to Amit's system would not frustrate Amit's goals" because costs could be reduced through known techniques. Appx42–43. The Board further credited evidence that Amit's modulation architecture was implemented in silicon, and the costs of scaling to multi-carrier modulation would not have been significant. *See* Appx526 (citing Appx1722; Appx3165, ¶ 73).

Entropic first argues that Jacobsen would add hardware costs that contradict Amit's cost-savings goals. Blue Br. 45–48. The Board addressed this head-on, crediting DISH's evidence that it was known in the art to lower costs by "dividing channels into subchannels, segmenting subchannels into disjointed groups, decreasing FFT size, and reducing the number of active channels." Appx42–43 (citing Appx524-525; Appx1717, 1721-1722; Appx3162-3164, ¶¶ 68–70). The

Board further credited DISH's argument that Amit's modulation architecture was implemented in silicon, and the costs of scaling to multi-carrier modulation in that context would not have been prohibitive. Appx43 (citing Appx526; Appx1722; Appx3165, ¶ 73). Entropic does not address these cost-mitigation techniques in its appeal brief, just as it failed to address them before the Board. *See* Appx44.

Entropic's second argument—that Jacobsen would add operational costs through increased power consumption—was also addressed. Blue Br. 48–49. The Board credited Dr. Williams's testimony that Mr. Garrett's power consumption analysis was unreliable because it relied on a specialized form of multi-carrier modulation (OFDM) not required by the claims, and because Mr. Garrett did not consider cost-savings techniques such as lowering the FFT size or how Jacobsen's modulation alleviates problems with frequency-domain ripple and interferers and improves computational efficiency. Appx43 (citing Appx525-526; Appx3344, 92:7–21; Appx3164-3165, ¶¶ 71–72). The Board was entitled to find these criticisms persuasive. Entropic's argument, again, amounts to an improper request that this Court reweigh the evidence anew on appeal. *See, e.g.*, *In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011).

Entropic's third argument, related to added complexity, follows the same pattern. Blue Br. 49–50. The Board found that DISH demonstrated that there were known techniques for reducing the additional complexity, and, moreover, that these

techniques provided benefits such as improved transmission efficiency and high spectral efficiencies. Appx44; *see also e.g.*, Appx3163, ¶ 69; Appx3164, ¶ 71.

The law is well-settled that "[s]imultaneous advantages and disadvantages . . . do[] not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). As this Court explained in *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 795 (Fed. Cir. 2021), even in *KSR* itself, "evidence indicating that a prior-art product was 'bulky, complex, and expensive' wasn't on its own enough to dismiss it as 'too flawed to upgrade.'" *Id.* (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 425–26 (2007)). Instead, "the benefits, both lost and gained, should be weighed against one another." *Winner Int'l Royalty v. Wang,* 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000). The Board performed precisely this analysis and found the benefits outweighed the costs and drawbacks. Entropic's cost and complexity arguments are exactly the type of tradeoff analysis the Board conducted and resolved against Entropic.

### D.    Entropic Requests Improper Reweighing of Evidence

In sum, the Board weighed the competing evidence about costs and benefits and made a factual determination. Mr. Garrett testified about drawbacks; Dr. Williams testified about benefits and cost-mitigation techniques. The Board credited Dr. Williams. Under substantial evidence review, that determination cannot be disturbed simply because Entropic disagrees with the outcome. *See Regents of*

45

*the Univ. of Minn.*, 61 F.4th at 1358; *Boston Sci. SciMed*, 811 F. App'x at 625 n.2 ("we defer to the [PTAB's] findings concerning the credibility of expert witnesses").

Entropic's brief effectively asks this Court to re-credit Mr. Garrett's testimony over Dr. Williams's, to re-evaluate the significance of Amit's cost-savings goals, and to re-assess whether the benefits of multi-carrier modulation outweigh the alleged costs. These are quintessential factual questions that the Board resolved based on the record before it. The Board's finding that a POSITA would have found the combination "overall beneficial in at least some circumstances" (Appx44) is supported by substantial evidence and should not be set aside.[6]

---

[6] Separately, in a finding that Entropic does not challenge, the Board found motivation to combine the Kliger and Isaksson references for Ground 1. Specifically, the Board found that Kliger identifies problems of splitter reflections causing ISI, external noise, and dynamic network conditions adversely affecting home network communications. Appx19. Isaksson teaches using multi-carrier modulation with synchronized bit-loading based on carrier SNR to address these types of impairments. Appx19–20. The Board agreed with DISH that the combination "amounts to the use of known techniques (Isaksson's synchronized bit-loading) to improve similar devices in the same way (overcoming interference and maintaining connections with other modems)." Appx19 (citations omitted). Crediting Dr. Williams's testimony, the Board rejected Entropic's argument that Kliger already solves the impairment issues, and that Isaksson's base sync frames would not function in Kliger's network and that the combination would alter Kliger's "principle of operation." Appx19–22. The Board also found that a POSITA would have had a reasonable expectation of success in making the Ground 1 combination. Appx23–24.

## V.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT JACOBSEN IS PRIOR ART

Entropic argues that the Board committed legal error by relying on the date listed in Jacobsen's text, which Entropic alleges constitutes hearsay, to establish the document's publication date. Blue Br. 51–57. This argument mischaracterizes the Board's analysis, which rested on the totality of the evidence—not solely on Jacobsen's text. Like with motivation to combine, Entropic's argument only impacts the Amit, Jacobsen, and Isaksson combination (Ground 2), and not the Kliger and Isaksson combination (Ground 1) that the Board separately found rendered the '518 patent obvious.

### A.    The Totality of the Evidence Supports Public Accessibility

The Board relied on multiple independent evidentiary sources to conclude that Jacobsen was publicly accessible more than one year before the '518 patent's priority date. Appx37–39; *see In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009) (explaining that public accessibility must be based on "all the facts and circumstances surrounding the disclosure"). First, Jacobsen itself bears markings indicating it is one of the NCTA 1994 Technical Papers related to the 43rd Annual NCTA Convention and Exposition. Appx1547-1549. Second, Ms. Munford, a librarian with specialized training in library and information science, testified that the Linda Hall Library acquired Jacobsen on September 19, 1995, based on the library MARC (machine-readable cataloging) record's "008 field." Appx1121, ¶ 9;

47

Appx3003, ¶ 17. Third, the MARC record corroborated the acquisition date. Appx36-38. Fourth, Dr. Williams's testimony and other, later publications of Jacobsen that cite back to the Jacobsen reference at issue further corroborated its availability. Appx38 (citing Appx1121, ¶ 8; Appx1127-1128, ¶¶ 27–28; Appx2997, ¶ 3; Appx3002-3003, ¶ 16; Appx3003 ¶ 18; Appx1031, ¶ 157).

Under *In re Hall*, 781 F.2d 897, 899–900 (Fed. Cir. 1986), standard library cataloging evidence suffices to establish prior art status. "[A] single cataloged thesis in one university library" constitutes sufficient accessibility to those interested in the art. *Id.* Courts have long recognized and relied on library cataloging records as evidence of public accessibility. *See, e.g.*, *In re NTP*, 654 F.3d at 1297 (relying on library cataloguing records as evidence of accessibility); *Telefonaktiebolaget LM Ericsson v. TCL Corp.*, 941 F.3d 1341, 1346 (Fed. Cir. 2019) (similar); *ION, Inc. v. Sercel, Inc.*, No. 5:06-CV-236 (DF), 2009 WL 10677701, at *3 (E.D. Tex. Dec. 11, 2009) (similar). Here, the evidence goes well beyond a single cataloged thesis—it includes librarian testimony, library records, documentation about the in-person convention to which the paper was submitted, and corroborating publications and evidence.

## B.     The Board Did Not Rely on Inadmissible Hearsay

Entropic argues that the Board's reference to what Jacobsen indicates "[b]y its own terms" constitutes hearsay. Blue Br. 51. This overstates the role of

48

Jacobsen's own text in the Board's analysis. The Board's finding rested primarily on Ms. Munford's testimony regarding the Linda Hall Library's acquisition and cataloging of Jacobsen. Appx38–39. The Board's reference to Jacobsen's markings was contextual, establishing what the document is and providing background for Ms. Munford's testimony—not to prove the truth of Jacobsen's publication date solely from the document itself.

In any event, MARC records are properly considered as business records under Federal Rule of Evidence 803(6) when authenticated by qualified witnesses familiar with library cataloging procedures. *See VidStream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1065–67 (Fed. Cir. 2020) (considering MARC records as part of the totality of evidence to establish public accessibility when supported by expert testimony on library cataloging). Ms. Munford provided precisely this authentication. Appx1120-1121, ¶¶ 7–9; Appx2997-3003, ¶¶ 3–18. And Entropic has failed to present any evidence to challenge that authentication.

## C.    Entropic's Attacks on the Evidence Are Unavailing

Entropic argues that MARC records are "editable" and therefore unreliable. Blue Br. 54–55.[7] The Board addressed this argument directly: "even if MARC

---

[7] Entropic's argument that the Board improperly shifted the burden of proof regarding MARC record alteration mischaracterizes the Board's analysis. Blue Br. 56. The Board did not shift any burden; it simply observed that Entropic's speculation about possible editing was unsupported by any evidence in the record. Appx38-39.

records are editable . . . Patent Owner has not shown that the MARC record for Jacobsen was altered, and Ms. Munford states that such an alteration would have been 'highly unusual' practice for a library." Appx38–39 (citing Appx3001, ¶ 14). Speculation about the theoretical possibility of editing does not overcome the prima facie evidence of the library record. The Board did not improperly shift the burden—it correctly observed that Entropic's speculation was unsupported by any evidence in the record. *Cf. In re NTP*, 654 F.3d at 1296 (rejecting unsubstantiated allegation of potential alterations of relevant documentation).

Entropic also argues that new releases of serial journals like the collection containing Jacobsen are appended to existing MARC records without updates indicating when a specific volume was received. Blue Br. 55 (citing Appx3777, 19:22–24). But Ms. Munford's testimony specifically addressed this concern. She testified that the MARC record's "008 field"—the field showing the library's acquisition date—showed that the Linda Hall Library first acquired Jacobsen on September 19, 1995. Appx1121, ¶ 9; Appx3003, ¶ 17. Ms. Munford explained that Jacobsen was made available to the public "shortly after" this date. Appx1121, ¶ 9. The Board was entitled to credit this testimony.

Entropic then argues that Ms. Munford's testimony is inadequate because she is a library specialist and not a POSITA with respect to the technology at issue. Blue Br. 52–54. The Board correctly rejected this argument: "There is no requirement in

50

the law for Ms. Munford to be an interested person or POSITA in order for her to testify about how the Linda Hall Library acquired and cataloged Jacobsen so that interested persons would be able to access it." Appx38. Ms. Munford's testimony relates to the factual question of accessibility, not to the technical content of the reference. She further testified that "MARC records are used by the public to discover materials within a library's collection, and that library users, which would include interested persons and POSITAs, do not require knowledge of how MARC records are maintained in order to use them." Appx38 (citing Appx2999, ¶ 8). A library patron need not understand the internal mechanics of MARC records to find a cataloged reference in the library's collection.

Entropic argues that Dr. Williams "cannot provide substantial evidence because he did not offer an opinion on the availability of Jacobsen." Blue Br. 54. But even setting aside Dr. Williams's testimony on this point, as discussed *supra*, the Board's finding rests primarily on Ms. Munford's library testimony and the documentary evidence, which are independently sufficient sources for substantial evidence supporting the Board's finding.

Finally, Entropic argues that the Board's reference to the NCTA Convention "should be ignored" because DISH's prior art theory is based on the printed publication indexed at the Linda Hall Library. Blue Br. 56. This misses the point. The Board cited the Convention not as the sole basis for its finding, but as

51

corroborating evidence supporting Jacobsen's public accessibility. The convention listing corroborates the timing and dissemination of the paper, and the Board was entitled to consider it as part of the totality of the evidence. *See VidStream*, 981 F.3d at 1065–67 (considering multiple types of evidence in the public accessibility analysis).

### D.    Impact of Any Error Is Limited to Ground 2

Even if the Court were to find error in the Board's prior art treatment of Jacobsen—which it should not—that error would affect only Ground 2 (Amit, Jacobsen, and Isaksson). Ground 1 (Kliger and Isaksson) does not rely on Jacobsen. The Board independently found claims 1 and 3 unpatentable under Ground 1. Appx30–31. Thus, even if Jacobsen were excluded as prior art, the Board's decision would stand on Ground 1 alone. Accordingly, any alleged error regarding Jacobsen's prior art status cannot provide a basis for reversal of the Board's ultimate determination of unpatentability.

In sum, the Board's finding that Jacobsen is § 102(b) prior art is supported by the totality of the evidence—librarian testimony, MARC records, documentation about the in-person convention to which the paper was submitted, corroborating publications, and expert testimony—and should not be disturbed.

52

## **CONCLUSION**

The Board's Final Written Decision is supported by substantial evidence at every step. The Board properly defined the level of skill based on the '518 patent's own disclosures, which describe the technical field as "broadband communication networks," repeatedly refer to and incorporate non-coaxial prior art, and describe teachings applicable across wired mediums. The Board correctly identified Isaksson as analogous art pertinent to the shared problem of channel impairments—ISI, noise, and attenuation—that both the '518 patent and Isaksson address through bit loading. The Board reasonably found motivation to combine the references based on expert testimony weighing the technological benefits of multi-carrier modulation against the alleged costs. And for Ground 2, the Board properly found Jacobsen to be prior art based on the totality of the evidence, including librarian testimony, library acquisition records, and corroborating documentation.

Entropic's appeal merely asks this Court to reweigh the facts—to prefer its expert over DISH's, to adopt its narrower reading of the patent over the Board's, and to draw different inferences from the same record. That is not the function of substantial evidence review. Because a reasonable mind could accept the evidence the Board relied upon as adequate to support its conclusions, the Board's decision must be affirmed.

For these reasons, Appellees respectfully ask this Court to affirm the Board's Final Written Decision finding claims 1 and 3 of the '518 patent unpatentable. Should this Court reverse the Board in any manner that would alter the Board's original decision on unpatentability, Appellees respectfully request that the Court remand this case to the Board for further proceedings.

Dated:  April 20, 2026

Respectfully submitted,

*/s/ Adam R. Shartzer*

Ruffin B. Cordell
Adam R. Shartzer
Michael J. Ballanco
FISH & RICHARDSON P.C.
1000 Maine Avenue S.W., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
shartzer@fr.com

Christopher S. Marchese
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
marchese@fr.com

Alyaman Amer
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
Tel:  (214) 747-5070
amer@fr.com

**Attorneys for Appellee**
**DISH Network L.L.C.**

Cory C. Bell
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
2 Seaport Lane, 6th Floor
Boston, MA 02210
Tel: (617) 646-1641
cory.bell@finnegan.com

Daniel C. Tucker
FINNEGAN, HENDERSON, FARABOW

55

GARRETT & DUNNER, LLP
1875 Explorer St, 8th Floor
Reston, VA 20190
Tel: (571) 203-2793
daniel.tucker@finnegan.com

Yongyuan G. Rice
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue N.W.
Washington, DC 20001
Tel: (202) 714-5958
michelle.rice@finnegan.com

***Attorneys for Appellee DirecTV, LLC***

56

## **CERTIFICATE OF SERVICE AND FILING**

I certify that on April 20, 2026, I electronically filed the foregoing **RESPONSE BRIEF** of Appellees DISH Network L.L.C. and DirecTV, LLC using the Court's CM/ECF filing system. Counsel for appellant were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

/s/ *Adam R. Shartzer*
Adam R. Shartzer

## CERTIFICATE OF COMPLIANCE

The **RESPONSE BRIEF** of Appellees DISH Network L.L.C. and DirecTV, LLC is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The brief contains 11,567 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 in Times New Roman, 14 Point.

Dated: April 20, 2026                                  /s/ *Adam R. Shartzer*
                                                                   Adam R. Shartzer